UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CHASE CORPORATION,               )
                                 )
            Plaintiff,           )
                                 )
      v.                         )      Case No. 1:24CV351
                                 )
QUINT BAREFOOT and               )
R&J REPACKAGING, LLC,            )
                                 )
            Defendants.          )

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on two separate Motions to Dismiss filed by Defendant Quint Barefoot ("Barefoot") [Doc. #12] and Defendant R&J Repackaging, LLC ("R&J") [Doc. #14]. In this case, Plaintiff Chase Corporation alleges that its former employee and contractor, Defendant Barefoot, began working for Plaintiff's competitor, Defendant R&J, using Plaintiff's trade secrets and confidential information, in violation of Barefoot's Independent Contractor Agreement and in violation of state and federal law. Plaintiff brings this action against Barefoot and R&J alleging claims for breach of contract and the implied covenant of good faith and fair dealing, wrongful interference, misappropriation of trade secrets, conversion, unfair competition and deceptive trade practices, civil conspiracy, and unjust enrichment. For the reasons stated below, the Court recommends that the Motions to Dismiss be denied, except that Defendant Barefoot's Motion be granted solely as to Plaintiff's claims against him for conversion and civil conspiracy, and that Defendant R&J's Motion be

granted solely as to Plaintiff's claims against it for civil conspiracy and unjust enrichment, as further set out below.

## I.    FACTUAL BACKGROUND

Plaintiff, Chase Corporation ("Chase"), is a materials manufacturer that purchased assets, intellectual property, membership interests, and stock from Stewart Group Limited, Explortec, Inc., and Zappa-Tec, LLC in December 2017. (Compl. [Doc. # 1] ¶ 7.) Defendant Barefoot was a principal and/or member-manager of Zappa-Tec, and in connection with the transaction, he executed an employment agreement to work for Chase after the transaction. (Compl. ¶¶ 8, 9.) Barefoot was employed by Chase pursuant to that employment agreement from December 19, 2017, until July 4, 2020, when he asked to "scale back from employment." (Compl. ¶¶ 10, 11.) At the conclusion of his official employment, Barefoot continued his relationship with Chase as an independent contractor. Barefoot and Chase executed an Independent Contractor Agreement ("the Agreement") in July 2020. (Compl. ¶ 11.) The Agreement outlined the terms of engagement between Chase and Barefoot and included as part of its terms a non-disclosure clause, a conflict-of-interest clause, and a non-compete clause. (Compl. ¶¶ 11-14.) Under the Agreement, Barefoot agreed to not use Chase's confidential information for any purpose other than performance of his service to Chase, and agreed not to disclose Chase's confidential information to any third party, at any time, during or after his engagement with Chase. (Compl. ¶ 11.) Barefoot also agreed not to take action that conflicted with his obligations to Chase during the term of the Agreement, and agreed not to disparage Chase during or after the term of the Agreement. (Compl. ¶ 13.) Finally, Barefoot agreed not to compete with Chase or aid another person or entity to compete with

2

Chase, or solicit away Chase's customers or clients, during the term of the Agreement and for two years thereafter. (Compl. ¶¶ 11, 14.) The Complaint alleges that as part of his position with Chase, Barefoot had access to Chase's confidential information and intellectual property, including identity and contact information for customers, Chase's customer technical specifications for super absorbent polymer products, supplier/manufacturer identities and negotiated pricing, "pricing methodology for processing and/or tolling services," materials testing and performance data, and internal pricing data. (Compl. ¶ 18.) The Complaint alleges that the Agreement was never officially terminated, but that in September 2020 Barefoot requested "to step away from Chase Corp. to devote more time to an unrelated business," and his last compensation related to the Agreement was in October 2020, although he continued to communicate with Chase Corporation to assist Chase's sales teams. (Compl. ¶¶ 15–16.)

The Complaint alleges that using his insider knowledge and Chase's confidential and protected information, Barefoot breached the Agreement during its term and during the two-year non-compete period by engaging in competitive activity; assisting Chase's competitor, R&J, using Chase's confidential information; interfering with Chase's business relationships; reducing the business conducted by Chase; and disparaging, demeaning, or denigrating Chase's reputation in the market. (Compl. ¶ 19.) Chase also alleges that Barefoot and R&J agreed to use Chase's trade secrets in a way that resulted in business being diverted from Chase to R&J. (Compl. ¶ 19.) Barefoot and R&J both move to dismiss certain claims set forth in the Complaint on the basis of failure to state a claim, although Defendants concede that at least some claims are going forward. The Court will review each claim in turn.

3

II. **DISCUSSION**

Both Defendants move to dismiss certain claims brought against them pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that Plaintiff has failed to state a claim upon which relief can be granted, at least as to some claims or parts of those claims. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard does not require "detailed factual allegations," but it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. A claim is facially plausible when the plaintiff provides enough factual content to enable the court to reasonably infer that the defendant is liable for the misconduct alleged. Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In this way, Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. The Court must accept as true all of the factual allegations contained in a complaint, but is not bound to accept legal conclusions. Iqbal, 556 U.S. at 678. Thus, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

4

**Count 1:**     **Breach of Contract and Breach of the Implied Covenant of Good
Faith and Fair Dealing (against Defendant Barefoot only)**

Plaintiff first brings a claim for breach of contract and breach of the implied covenant of good faith and fair dealing against Defendant Barefoot based on the Agreement between them. Specifically, the Complaint alleges that Defendant Barefoot violated three provisions of the Agreement: (1) the Confidentiality Provision (Section 6), pursuant to which Barefoot agreed to not use Chase's confidential information for any purpose other than performance of his service to Chase, and agreed not to disclose Chase's confidential information to any third party, at any time, during or after his engagement with Chase; (2) the Non-Conflict of Interest Provision (Section 7), pursuant to which Barefoot agreed not to take action that conflicted with his obligations to Chase during the term of the Agreement, and agreed not to disparage or denigrate Chase before or after the term of the Agreement; and (3) the Non-Compete Provision (Section 8), pursuant to which Barefoot agreed not to compete, or assist another entity to compete, with Chase, or solicit away Chase's customers or clients, during the term of the Agreement and for two years thereafter. (Compl. ¶¶ 35–48.)

"To allege breach of contract in North Carolina, a complaint must allege facts sufficient to prove that (1) there was a valid contract between the parties and (2) that the defendant breached the terms of that contract." Superior Performers, LLC v. Carey, 716 F. Supp. 3d 373, 378 (M.D.N.C. 2024); see also Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276 (2019); accord Fitzgerald Fruit Farms, LLC v. Harris, 858 F. App'x 625, 625 (4th Cir. 2021) (per curiam). Further, "[e]very contract includes an 'implied covenant of good faith and fair dealing that neither party will do anything that injures the right of the other to receive the benefits of the agreement.'" Superior Performers, 716 F. Supp. 3d at 379 (quoting Dillon v.

5

Leazer Grp., Inc., 374 F. Supp. 3d 547, 556 (E.D.N.C. 2019) and Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985)).

In the Motions to Dismiss, Defendant Barefoot does not dispute the existence of a contract between Plaintiff and himself. Defendant Barefoot also concedes that Plaintiff has stated a breach of contract claim for breach of the Confidentiality Provision of the Agreement (Section 6). Specifically, as to the Confidentiality Provision (Section 6), Plaintiff alleges that "in at least one quote with Waste Management Co. for the Duke Energy Coal Ash project, on August 22, 2023, Defendant Barefoot used Chase Corp.'s confidential information of the SAP products to provide a quote for Defendant R&J Repackaging rather than for Chase Corp.," and that "Defendant Barefoot used Chase Corp.'s confidential information on the product design for Defendant R&J Repackaging, in order to assist with the product's qualification by Sabee." (Compl. ¶¶ 22, 31.) Plaintiff contends that Defendant Barefoot "undercut[] Chase Corp.'s confidential pricing structures to specifically attempt to move strategic accounts from Chase Corp. to Defendant R&J Repackaging," and that he "us[ed] confidential information on the SAP products from materials testing/performance data and qualification standards to quote customers for Defendant R&J Repackaging and/or others in direct competition on the same products in the same market as Chase Corp." (Compl. ¶ 40(d), (i).) Plaintiff contends that Defendant Barefoot thus violated Section 6 of the Agreement, which provides that:

> The Contractor will not at any time, during or after his engagement with the Company, use any Confidential Information for any purpose other than the performance of his services to the Company, nor will he disclose any Confidential Information to any third party without the prior, written consent of the CEO of the Company or his/her designee.

6

(Compl. ¶ 11; Independent Contractor Agreement [Doc. #13-1] at 4.)[1]  In the Motion to Dismiss, Defendant Barefoot concedes "for the purposes of the Motion only, that the Complaint states a claim for breach of Section 6 [the Confidentiality Provision]" of the Agreement.  (Barefoot Br. [Doc. #13] at 4, n.6).  Thus, this claim is proceeding.  In addition, Defendant Barefoot's Motion to Dismiss does not address or seek dismissal of Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  As such, the claim for breach of contract and breach of the implied covenant of good faith and fair dealing is proceeding to discovery, regardless of any of the other contentions raised by Defendant Barefoot.  The Court will still consider Defendant Barefoot's contentions in the Motion to Dismiss as to the other Sections of the Agreement (Sections 7 and 8), but as noted in the discussion below, given that the breach of contract claim is proceeding to discovery in any event, Defendant Barefoot's contentions can be addressed and the claims narrowed as appropriate after discovery.

Section 7 of the Agreement (the Conflict of Interest Provision) provides that:

The Contractor agrees that <u>during his engagement with the Company</u>, he will take no action which conflicts with his obligations to the Company.

The Contractor will not disparage, demean, or denigrate the Company or any of its employees, directors, products, services, or customers, <u>either during or after the Term of this Agreement</u>, provided that nothing in this provision

---

[1] Plaintiff references the Agreement throughout the Complaint and provides several excerpts from the Agreement in the Complaint.  Defendant Barefoot provided the Agreement in its totality attached to his Motion to Dismiss.  Plaintiff has not raised a question as to the validity or authenticity of the Agreement as attached to Defendant Barefoot's Motion.  Because of Plaintiff's reliance on the Agreement and inclusion of excerpts in the Complaint, the Court will consider the Agreement as provided by Defendant without converting Barefoot's motion into one for summary judgment.  <u>See Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007) (noting that in ruling on a Rule 12(b)(6) motion to dismiss, courts may consider "documents incorporated into the complaint by reference"); <u>see also Goines v. Valley Cmty. Servs. Bd.</u>, 822 F.3d 159, 166 (4th Cir. 2016) (citations omitted) (noting that courts will consider documents that are "integral to the complaint" and authentic).

7

shall prohibit the Contractors from testifying truthfully under oath in any proceeding in which he is required to testify.

(Compl. ¶ 13; Independent Contractor Agreement [Doc. #13-1] at 4 (emphasis added).) Defendant Barefoot contends that Plaintiff has failed to allege a violation of Section 7 because this Conflict of Interest Provision was in effect only during the term of the Agreement, and that any alleged actions by Barefoot occurred after October 2020 when the Agreement was alleged to have terminated. However, as reflected in the underlined provisions above, some of the obligations in Section 7 continued "during or after the Term of the Agreement," specifically with respect to the obligation that Defendant Barefoot not disparage, demean, or denigrate the Company. In the Complaint, Plaintiff alleges that Defendant Barefoot "disparaged Chase Corp. in order to take business away from Chase Corp." with respect to customer Sabee. (Compl. ¶ 32.) Defendant Barefoot does not address this contention or otherwise seek dismissal of this alleged violation of Section 7 of the Agreement.

With respect to the obligation in Section 7 that Defendant Barefoot "take no action which conflicts with his obligations to the Company" during his engagement with the Company, the Complaint notes a potential factual dispute on when and if the Agreement was terminated, and therefore pleads in the alternative. The Complaint first alleges that the Agreement "never officially terminated (i.e. the Term continued)" (Compl. ¶ 15), and that Barefoot continued to communicate with Plaintiff's sales team to assist Plaintiff (Compl. ¶ 16). Plaintiff also alleges that Defendant Barefoot continued to receive emails from Chase customers at his Chase account, including communications and sales orders (Compl. ¶ 40(j)), but that he failed to forward those inquiries to Chase and instead responded from a personal email address to conceal his efforts to divert that business away from Chase. (Compl. ¶ 27).

8

Plaintiff <u>alternatively</u> alleges that the Agreement terminated in October 2020 at the earliest because Barefoot received compensation under the Agreement through October 2020. Given these contentions, there is at least a basis for the alleged violation of the Conflict of Interest Provision (Section 7) during the term of the Agreement, and any further factual disputes regarding if or when the Agreement terminated and if or when any conflicted conduct occurred can be further considered and resolved after discovery.

Finally, Section 8 of the Agreement (the Non-Compete Provision) provides that:

> In consideration of the opportunity to provide consulting services to the Company, the Contractor agrees that during the Term of this Agreement, and thereafter for two (2) years, the Employee will not directly or indirectly, individually or as a consultant to, or as an employee, officer, director, manager, stockholder, partner, member or other owner of, or participant in, any business entity:
>
> (a) engage in or assist any other person or entity to engage in any business that competes with any business in which the Company or any of its affiliates is engaging and as to which the Contractor provided services to the Company either before or during the term of this Agreement; or
>
> (b) attempt or assist any other person or entity in their attempt to hire, solicit or endeavor to entice away from the Company or any of its affiliates, or offer employment or any consulting arrangement to, or otherwise interfere with the business relationship of the Company or its affiliates with, any person or entity who is, or was within the one-year period immediately prior thereto, an employee of or a consulate to the Company; or
>
> (c) attempt or assist any other person or entity in their attempt to solicit or endeavor to entice away from the Company or any of its affiliates, reduce the business conducted with the Company or any of its affiliates of, or otherwise interfere with the business relationship of the Company or any of its affiliates with, any person or entity who is, or was within the one-year period immediately prior thereto, a customer or client of, supplier, vendor or service provider to, or other party having business relations with, the Company or its affiliates.

9

(Compl. ¶ 14; Independent Contractor Agreement at 5.)[2]  In the Motion to Dismiss, Defendant Barefoot argues that he received his last payment from Chase in October 2020, and that therefore the Non-Compete Provision of the Agreement expired "no later than October 2022." (Barefoot Br. at 3.)  Barefoot acknowledges that the Complaint alleges that he breached the Agreement by engaging in competitive activity, but he contends that the alleged activity was during the timeframe "after his engagement with Chase ended and *almost all of which* is alleged to have occurred after the Restrictive Covenant Period expired." (Barefoot Br. at 3 (emphasis added/altered)).

In considering these contentions, the Court notes first that even if the Agreement ended with the last payment in October 2020, the two-year period for the Non-Compete Provision ran until October 2022.  Notably, cloaked within Barefoot's contention is his acknowledgement that Plaintiff alleges that he engaged in *at least some* breaching activity in April 2022, when Barefoot is alleged to have communicated with EE Zimmerman to solicit an order for competitors instead of Chase, and in July 2022, when Plaintiff is alleged to have started the SAP product qualification process with R&J for customer Sabee.  (See Compl. ¶¶ 26, 30.)  Therefore, there is at least some conduct alleged to have occurred during the two-year period, in violation of the provisions of Section 8.  Any further factual disputes regarding when any violating conduct occurred can be further considered and resolved after discovery.

Defendant Barefoot also argues that the Non-Compete Provision is unenforceable because it lacks territorial restriction, because it prohibits work unrelated to the work he

---

[2] There are no allegations in the Complaint regarding Section 8(b), so the Court considers here Sections 8(a) and 8(c).

10

performed for Chase, because it does not define the term "affiliates", and because it includes a prohibition on restricted conduct "directly or indirectly" without limitation. (Barefoot Br. at 6.) Defendant Barefoot also argues that the non-solicitation clause of the Non-Compete Provision is unenforceable for similar reasons, that Chase has no legitimate business interest in protecting its undefined affiliates, that the Provision is not limited to customers or clients Barefoot had contact with, and that the Provision is not limited to customers of clients of Chase or its affiliates during the term of the Agreement. (Barefoot Br. at 9.)

In response, Plaintiff notes that the lack of territorial restriction is reasonable here to protect Plaintiff's legitimate business interests because Plaintiff is a national company and the competitive conduct involved Plaintiff's clients in California, Pennsylvania, Texas, and Wisconsin, and Plaintiff contends that the two-year period for the Non-Compete Provision was reasonable in that context. Plaintiff also contends that the Non-Compete Provision specifically limited Barefoot from engaging in business with a competitor "as to which the Contractor provided services to the company," and limited the restriction to "Contractor provided services," thus limiting the restriction to the type of work Barefoot performed for Chase. (Pl.'s Resp. [Doc. #16] at 5.) With respect to the inclusion of "affiliates", Plaintiff notes that it should have an opportunity to present evidence of its legitimate business interests, and that Barefoot was "uniquely aware of these interests because of his history in the purchase of the companies that led to Chase's market share in N.C., and his employment with Chase immediately before" the Agreement. (Id. at 6.) Plaintiff further notes that this action seeks to enforce the Agreement with regard to the direct adverse impact on Chase, and does not rely on contentions as to any affiliates. Similarly, Plaintiff notes that any objection to the

11

phrase "directly or indirectly" would not affect the determination here, because the Provision here does not prohibit associating with "any business providing similar services", and instead applies only to Defendant engaging in or assisting in a business that "competes" with Chase and only with respect to "Contractor provided services." (Id. at 7-8.) Finally, Plaintiff alternatively argues that if any terms are ultimately determined to be overbroad, the Court may follow the "blue pencil" doctrine to strike phrases or clauses, including "or any of its affiliates" and "or indirectly," since Plaintiff seeks to bring claims related to direct interference with customers or suppliers of Chase. (Id. at 8-9.) Plaintiff asserts the same contentions with respect to the non-solicitation clause in the Non-Compete Provision.

Having considered the briefing, the Court concludes that Plaintiff's contentions are well taken, and that at this early stage of the case the Court cannot determine that the Non-Compete Provision is unreasonable and unenforceable, and further that these issues could be addressed under North Carolina's "blue pencil" process if necessary. "[I]n North Carolina, restrictive covenants between an employer and employee are valid and enforceable if they are (1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." United Laby's, Inc. v. Kuykendall, 322 N.C. 643, 649-50 (1988). It appears that all of Defendant's contentions relate to the last two prongs of this analysis.

However, in determining whether the provision is reasonable both as to time and territory, the Court considers multiple factors, including "(1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of

12

the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation." Hartman v. W.H. Odell & Assocs., Inc., 117 N.C. App. 307, 312-13 (1994); see also Manpower of Guilford Co. v. Hedgecock, 42 N.C. App. 515 (1979). A two-year term is "well within the range that the North Carolina courts have deemed reasonable," and a nationwide scope can be appropriate if supported by an analysis of these factors. Phillips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 716-17 (M.D.N.C. 2009); Mkt. Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 153-54 (1999). The cases cited by Defendant Barefoot primarily involve determinations after some period of discovery, either on a preliminary injunction or at summary judgment or at trial. Here, the Court would need to consider matters outside the pleadings to address these factors and make a reasonableness determination, and such a determination is appropriately made after a period of discovery, particularly here where the breach of contract claim is proceeding in any event.

Similarly with respect to whether the Non-Compete Provision is against public policy, an agreement is not against public policy if it is designed to project a legitimate business interest. "[P]rotection of customer relationships and good will against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." Kuykendall, 322 N.C. at 651. This "customer contact" interest arises where an employee "through personal contact with plaintiff's customers, establish[es] business good will which is a valuable asset of [plaintiff]," and which would allow the departing employee an "unfair competitive position" if he goes into competition with plaintiff. Kuykendall, 322 N.C. at 651. Likewise, if the employee was able to "acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers" or

other similar information, the employer has a legitimate interest in preventing the departing employee from "engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge . . . and thereby gain an unfair advantage." Id. at 650-51. Thus, an employer may have a legitimate interest, which would support a non-compete agreement, based on considerations such as the employee's contacts with customers, or the employee's acquisition of information such as customer names and requirements, or both. Here, such a determination would involve consideration of the nature of Defendant Barefoot's work for Plaintiff, including his contact with specific customers and the information he acquired in that role.

The Court also notes that a non-competition agreement may be overly broad, and thus outside legitimate business interests, where it would "prohibit the former employee from engaging in future work that is distinct from the duties actually performed by that employee." Phillips, 631 F. Supp. 2d at 705. Here, however, the Non-Compete Provision precludes Barefoot from engaging in a business that competes with Chase "and as to which [Barefoot] provided services to [Chase Corp.]", thus limiting the Non-Compete Provision to services that Barefoot provided to Chase, described in the Agreement to include:

- Assistance in identifying SAE opportunities for use with the Company's SAP materials
- Consulting services as required on material selections, application uses, and material characterizations/purchases from outside suppliers
- Consulting services on the SAM product line and potential new applications that could drive growth for the SAP business.

(Independent Contractor Agreement at 2, 5.) In addition, the appropriateness or need for such a limitation may depend on the specific responsibilities of Barefoot, including, for example, "evidence that Defendant had the responsibility for developing client-specific pricing

14

proposals or adjusting prices for competitive reasons or that Defendant was involved in the development and operation of his employer's bidding or pricing strategies." Copypro, Inc. v. Musgrove, 232 N.C. App. 194, 202 (2014); see also Precision Walls, Inc. v. Servie, 152 N.C. App. 630, 632 (2002).

At this stage in litigation, taking the facts as alleged in the Complaint in the light most favorable to Plaintiff and construing ambiguities in its favor, it appears that questions regarding the term of the Agreement and the reasonableness and enforceability of its terms are not capable of resolution on this Motion to Dismiss, and are more appropriately resolved with all of the claims together after discovery.[3] Therefore, Defendant Barefoot's Motion to Dismiss Count One, for breach of contract and breach of implied covenant of good faith and fair dealing, should be denied.

---

[3] The Court notes that some of the provisions of the Non-Compete Provision could be stricken under North Carolina's "blue pencil" process if Plaintiff fails to present a sufficient basis for a legitimate business interest. For example, the Non-Compete Provision includes "affiliates," which in some cases may be overly broad. However, Plaintiff contends that this term is very narrow in context, and that Plaintiff is aware of the internal information that would sufficiently define and support inclusion of "affiliates." The Court can consider that additional information after discovery, to determine whether that provision is overly broad and/or can be limited by the "blue pencil" process. Hartman, 117 N.C. App. at 317 ("When the language of a covenant not to compete is overly broad, North Carolina's 'blue pencil' rule severely limits what the court may do to alter the covenant. A court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant. The courts will not rewrite a contract if it is too broad but will simply not enforce it. If the contract is separable, however, and one part is reasonable, the courts will enforce the reasonable provision." (internal quotations omitted)); see also Superior Performers, Inc. v. Meaike, No. 1:13cv1149, 2014 WL 1412434 (M.D.N.C. Apr. 11, 2014). Similarly, the non-solicitation provision in Section 8(c) does not include a limitation to the services Defendant Barefoot provided to Chase, or the customers he served for Chase, and as drafted may preclude solicitation of customers that came to Chase after Defendant had left and the Agreement had terminated. Thus, it is possible that all or part of Section 8(c) would be blue penciled. However, Plaintiff notes that this analysis should be informed by the extent of Barefoot's involvement with customer and prospective customer information, which cannot be addressed at this early stage in the case. And as discussed above, the alleged conduct by Defendant Barefoot violates other provisions of the Agreement, such as Section 6, Section 7, and Section 8(a), so the Court need not address these issues now, and can consider them if necessary on a more complete record after discovery.

15

Count 2:     Wrongful Interference (against both Defendants)

Plaintiff's second claim is for tortious interference with existing business relations and with prospective economic advantage against both Defendants. Plaintiff alleges that it "had valid contractual relationships with customers in place" and that Defendants "convinced or attempted to convince [its] customers to terminate their contracts, prospective contracts and orders, and business agreements with [it, that were] in effect that had not yet expired." (Compl. ¶¶ 50, 52.) More specifically, Plaintiff alleges that Defendants wrongfully used its intellectual property and confidential information to undercut Plaintiff and negotiate more favorable pricing with suppliers and manufacturers to divert business away from Chase and to R&J, and Plaintiff points to the termination of prior agreements and prospective orders from Sabee and EE Zimmerman as direct evidence of Defendants' alleged interference with its existing business contracts and prospective economic advantage. (Compl. ¶¶ 53, 54.)

To state a claim for tortious interference with contract in North Carolina, a plaintiff must allege: (1) a valid contract between the plaintiff and a third party which confers upon plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff. Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc., 546 F. Supp. 3d 440, 452 (M.D.N.C. 2021) (citing Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 368 N.C. 693, 700 (2016)). A claim for tortious interference with prospective economic advantage is similar, requiring a plaintiff to set forth facts alleging that a party interfered with a business relationship by (1) maliciously inducing a person not to enter into a contract with a

16

third person; (2) that he would have entered into but for the interference; (3) damage proximately ensues; and (4) the interference is not done in the legitimate exercise of the interfering person's rights. Intercollegiate Women's Lacrosse Coaches Ass'n, 546 F. Supp. 3d at 454 (citation omitted).

In his Motion to Dismiss, Defendant Barefoot argues that any alleged interference claim raised by Plaintiff would have been justified or privileged because it was motivated by legitimate business purposes. Specifically, Barefoot contends that because the Complaint alleges that R&J was a direct competitor of Chase, and that Barefoot acted as an agent of R&J, any alleged interference was justified by a legitimate business interest in competition. (Barefoot Br. at 13.) Plaintiff responds that there was no legitimate business interest in light of Barefoot's business and contractual relationship with Plaintiff and his access to Plaintiff's confidential information. (Pl.'s Resp. [Doc. #16] at 13–14.) In this regard, legitimate competition can justify some business practices, including hiring an employee away from a competitor, but "the privilege [to interfere] is conditional or qualified; that is it is lost if exercised for a wrong purpose." Kuykendall, 322 N.C. at 662-63. Where "[t]he crux of plaintiff's complaint is that defendant purposely and maliciously solicited customers of plaintiff's in breach of the covenant not to compete," including "solicit[ing] the same customers he had serviced while employed by plaintiff," a tortious interference claim can proceed. Kuykendall, 322 N.C. at 662-63; see also Peoples Sec. Life Ins. Co. v. Hooks, 322 N.C. 216, 221 (1988) ("[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and *by means that are lawful*." (emphasis added)). Here, Plaintiff alleges that

17

Defendant Barefoot used confidential information of Plaintiff's, in violation of the Agreement and by misappropriating trade secrets, to undercut Plaintiff and interfere with Plaintiff's customers and suppliers on behalf of a competitor, also in violation of the Agreement. These allegations take the claim beyond legitimate competition.[4]

Defendant Barefoot also contends that Plaintiff has failed to allege sufficient facts to plausibly state a claim for tortious interference with contract or tortious interference with prospective economic advantage. However, as noted above, Plaintiff alleges misuse of its confidential information and violation of the Agreement, and Plaintiff further alleges that Barefoot contacted customers that had a business or contractual relationship with Chase in a manner to conceal on whose behalf he was contacting them (by using his Gmail account) to convince them to terminate their contracts, prospective contracts, future orders, and business agreements, and that at least two customers, Sabee and EE Zimmerman, terminated prior agreements as a result of Defendants' conduct and did not make future anticipated orders, including a "10-truck load per month deal" with Sabee that Defendant Barbee bragged about taking from Plaintiff.[5] Having considered these contentions, the Court concludes that Plaintiff has alleged sufficient facts to support its claim against Defendant Barefoot.

---

[4] Plaintiff also contends that Plaintiff has failed to allege malice. However, in this context, legal malice is simply "the intentional doing of a harmful act without legal justification." Murray v. Justice, 96 N.C. App. 169, 174 (1989) (quotation omitted). As discussed above, Plaintiff has alleged conduct by Defendants that would not be justified by legitimate competition.

[5] Plaintiff contends that Defendant has failed to allege anything more than a mere expectation of a continued business relationship. "In North Carolina, at the summary judgment stage, plaintiff's evidence of a 'mere expectation' that it would continue a business relationship is insufficient to satisfy the 'but for' causation element of a tortious interference claim. Instead, a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention. However, when considering allegations at the Rule 12(b)(6) stage, it is generally sufficient for a plaintiff to identify a customer by name and to allege that it would have obtained a contract with that customer but for the acts of the defendant." Elior, Inc. v. Thomas, No.

Defendant R&J also moves to dismiss this claim, arguing that while Plaintiff alleges that Defendant Barefoot had knowledge of Chase's contracts between Chase and its customers, the Complaint does not allege that R&J possessed the same knowledge. (R&J Br. [Doc. #15] at 3-4.) In response, Plaintiff contends that because it alleged that Barefoot was an agent of R&J, Barefoot's knowledge of the contracts can be imputed to R&J. In addition, Plaintiff notes that the Complaint specifically alleges that R&J hired Barefoot to engage in unlawful actions, and that R&J agreed with Plaintiff to do unlawful acts "in an effort to poach and solicit Chase Corp.'s customers and suppliers away," and alleges that R&J and Barefoot both "convinced or attempted to convince Chase Corp.'s customers to terminate their contracts" with Chase. (Pl.'s Resp. [Doc. #22] at 3-4; Compl. ¶¶ 52, 66, 92.)

With respect to these contentions, the Court notes that Plaintiff does allege that Barefoot acted as an agent of R&J. In addition, the Complaint alleges intentional conduct by R&J to work with Barefoot to interfere with Chase's customer and supplier contracts. Any dispute regarding whether Barefoot was in fact acting as an agent of R&J while engaging in the alleged activity, or whether R&J actually knew of and joined in Barefoot's unlawful conduct, cannot be resolved on a motion to dismiss.

R&J also argues that as one of Chase's competitors, it has a legitimate business interest in competing for business in the SAP market and therefore Plaintiff failed to allege malice. (R&J Br. at 5.) In response, Plaintiff contends that even if R&J was a competitor of Plaintiff, it engaged in unlawful acts to advance any interest it had, namely agreeing with Barefoot to

---

23CV12616, 2024 WL 1739861 at n.12 (N.C. Super. Ct. Apr. 22, 2024) (internal citations and quotations omitted).

19

engage in unlawful activity to its benefit by misusing confidential information and trade secrets and convincing or attempting to convince Plaintiff's customers to terminate their contracts and business agreements that had not expired. (Pl.'s Resp. [Doc. #22] at 4–5.) As noted above, these allegations of unlawful conduct take the claim beyond legitimate competition. In addition, as noted above, Plaintiff's allegations of wrongful conduct by Barefoot, as an agent of R&J, raise allegations of a motivation other than legitimate competition. See also Ga. Pac. Consumer Prods., LP v. Von Drehle Corp., 618 F.3d 441, 456-57 (4th Cir. 2010).[6]

Thus, Plaintiff has sufficiently alleged a plausible claim and has provided Defendants sufficient notice regarding the basis for the claims. This claim should go forward, and any further disputes on these issues are more appropriately resolved at summary judgment.

### Count 3: Misappropriation of Intellectual Property and Trade Secrets (against both Defendants)

Plaintiff contends that it has adequately pled a claim for misappropriation of intellectual property and trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA") 18 U.S.C. § 1836, et. seq., "and/or other applicable law," specifically the North Carolina Trade Secret Protection Act, North Carolian General Statute § 66-153 ("NC TSPA"). (Compl. ¶¶ 63, 69, 70, 71, 72, 73.) Plaintiff brings a claim for misappropriation of intellectual property and trade secrets against both Defendants, and alleges that it "is the owner of all intellectual property, including without limitation, the SAP products developed, tested for performance standards, qualified, marketed, and sold by Chase Corp., Confidential Information such as pricing,

---

[6] R&J also alleges that the Complaint fails to allege that any prospective contract would have been entered into but for its tortious interference. In response, Plaintiff contends that it identified specific customers by name that it would have obtained future orders from, but for Defendants' wrongdoing. As noted above, these allegations are sufficient at this stage in the case.

financial, licensing, customers' technical specifications, and Chase Corp.'s unique business model and concept of the processing of certain SAP products for sale," that it had taken measures to protect its intellectual property by restricting access and prohibiting disclosure, and that the intellectual property cannot be easily duplicated. (Compl. ¶¶ 60, 62.) Plaintiff alleges that Defendant Barefoot used its confidential information without authorization "including but not limited to, providing materials data, testing and performance results of the SAP product to a potential customer (Waste Management) to quote and sell product for Defendant R&J Repackaging and/or other third parties, [and] assisting Defendant R&J Repackaging in getting qualification with Sabee using Chase Corp.'s IP." (Compl. ¶ 63.) Plaintiff further alleges that Defendant R&J directed Barefoot to act as its agent and used Plaintiff's trade secrets to solicit business away from Plaintiff without Plaintiff's consent. (Compl. ¶ 66.)

Defendants move to dismiss Plaintiff's claim for misappropriation of intellectual property and trade secrets. Defendant Barefoot contends that dismissal of this claim is appropriate because Plaintiff failed to identify a trade secret with particularity. (Barefoot Br. at 19.) Defendant R&J similarly argues that Plaintiff fails to identify any alleged trade secret, and also contends that Plaintiff fails to allege that the trade secret impacts interstate or foreign commerce (for the DTSA) or that the misappropriation occurred in North Carolina (for the NCTSPA). (R&J Br. at 5-8.) In response, Plaintiff argues that it sufficiently identified its intellectual property including information related to its SAP products developed, its testing and performance standards, and customers' technical specifications developed by Plaintiff. Plaintiff contends that the allegations are sufficiently detailed to allow Defendants to identify

21

which trade secrets were misappropriated and are at issue. (Pl.'s Resp. [Doc. #16] at 20; Pl.'s Resp. [Doc. #22] at 9.) Plaintiff also contends that there are sufficient allegations in the complaint to raise an inference of impact on interstate commerce, given the allegations involving multiple national companies and sales contracts, and that there are sufficient allegations to raise an inference of misappropriation in North Carolina given Defendant Barefoot's residence in North Carolina, Defendant R&J's presence in North Carolina, and specific reference to use of Plaintiff's trade secrets related to a Duke Energy project. (Pl.'s Resp. [Doc. #22] at 11-13.)

The DTSA creates a private right of action for the misappropriation of trade secrets. 18 U.SC. § 1836(b). It was enacted to provide trade secret owners with an avenue to obtain civil remedies in federal court. <u>See</u> H.R. Rep. No. 114-529, at 196 (2016). Section 1836(b)(1) of the DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Under the DTSA, the term "trade secret" is defined as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C.A. § 1839. "To prevail on such a claim, a plaintiff must accordingly establish (1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." dmarcian, Inc. v. dmarcian Eur. BV, 60 F.4th 119, 141 (4th Cir. 2023).

The North Carolina Trade Secrets Protection Act is set forth at North Carolina General Statute § 66-153 et seq. Under that statute, "trade secret" means "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process" not generally known or ascertainable and that is the subject of reasonable efforts to maintain secrecy. N.C. Gen. Stat. § 66-152(3). Under North Carolina law, "[t]o plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." Krawiec v. Manly, 370 N.C. 602, 609 (2018) (quoting Washburn v. Yadkin Valley Bank & Tr. Co., 190 N.C. App. 315, 326 (2008)) (internal quotations omitted). Accordingly, the complaint must allege "with sufficient specificity either the trade secrets . . . allegedly misappropriated or the acts by which the alleged misappropriations were accomplished." Washburn, 190 N.C. App. at 327. "Federal district courts in North Carolina, including this district, have applied this pleading standard to claims under the North Carolina Trade Secrets Protection Act." RF Micro Devices, Inc. v. Xiang, No. 1:12CV967, 2013 WL 5462295, at *7 (M.D.N.C. Sept. 30, 2013).

Here, in support of its claim, Plaintiff alleges that Defendant Barefoot engaged with it as an employee and independent contractor pursuant to agreements that gave him access to

intellectual property owned solely by Plaintiff, including as it related to its business model and the development and processing of certain SAP Products, including Plaintiff's pricing and financials for those products, and "customers' technical specifications", which the Court reads as the specific technical specifications that Plaintiff developed for specific SAP products for each of its customers. (Compl. ¶¶ 60–62.) Further, Plaintiff alleges that Defendants, with Barefoot acting as an agent of R&J, misappropriated the claimed intellectual property by utilizing Plaintiff's intellectual property, including information associated with the development of the SAP product related to "a potential customer (Waste Management)[,] to quote and sell product for Defendant R&J Repackaging and/or other third parties," and also "assist[ed] Defendant R&J Repackaging in getting qualification with Sabee using Chase Corp.'s IP." (Compl. ¶ 63.) Based on the alleged relationship between Plaintiff and Barefoot, and the subsequent involvement between Barefoot and R&J, the Court concludes that Plaintiff's identification of the claimed trade secrets enables Defendants to delineate what they are accused of misappropriating. See Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 280 (2019) ("Within these sprawling lists, there are particular pieces of information that might constitute trade secrets . . . . In addition, while not expressly pleaded, this information, if compiled in a database or other form for each of Plaintiff's customers, might also constitute a trade secret. . . . The Court concludes that the allegations in this case, read generously, are minimally sufficient to put Defendants on notice of the trade secrets that they have allegedly misappropriated."). In addition, the Court finds that Plaintiff has alleged sufficient facts to support its claim that Defendants misappropriated the claimed trade secrets, and there are

24

sufficient allegations in the complaint, read as a whole, to raise a reasonable inference of impact on interstate commerce and misappropriation in North Carolina.

As in prior cases in this District, "[t]his [C]ourt finds that Plaintiff has adequately stated its claims for relief. Although Defendants may desire more specificity at this stage, the Complaint's allegations are sufficient to alert Defendants and this court to the trade secrets that have allegedly been misappropriated. The parties will have the opportunity to further delineate the trade secrets at issue in this lawsuit through the discovery process." RF Micro Devices, 2013 WL 5462295 at *7; see also River's Edge Pharms., LLC v. Gorbec Pharm. Servs., Inc., No. 1:10CV991, 2012 WL 1439133 (M.D.N.C. Apr. 12, 2012).

As such, the Court should deny Defendants' motions to dismiss Plaintiff's third claim for relief, and Plaintiff should be permitted to proceed on its claim for misappropriation of trade secrets.

### Count 4: Conversion (against Defendant Barefoot only)

Plaintiff brings a claim for conversion against Barefoot. "Conversion is defined in North Carolina as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" River's Edge Pharms., 2012 WL 1439133, at *11 (quoting State ex rel. Pilard v. Berninger, 154 N.C. App. 45, 57 (2002)). "As such, a party seeking relief for conversion must allege ownership of the property in question and a wrongful deprivation of that property. Furthermore, in cases where the defendant may have come rightfully in possession of the property at some point in time, demand by the owner of the property's return and refusal by the defendant become necessary elements of the tort." Id. (internal

25

citations omitted); see also Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc., 505 F. Supp. 3d 570, 585 (M.D.N.C. 2020) (quoting Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 523 (2012)). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." TSC Research, LLC v Bayer Chemicals Corp., 552 F. Supp. 2d 534, 542 (M.D.N.C. 2008) (quoting Lake Mary Ltd. P'ship v. Johnston, 142 N.C. App. 525, 551 (2001)). Accordingly, "only goods and personal property are properly the subjects of a claim for conversion." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 414 (2000). "[I]ntangible interests such as business opportunities and expectancy interests" are not subject to a conversion claim. Id.

In its Complaint, Plaintiff alleges that it was the rightful and legal owner of its intellectual property and confidential information and that Defendant Barefoot used, and continues to use, its intellectual property and confidential information in a manner that precludes it from "possessing and exercising its sole right of ownership and control over its IP and confidential information." (Compl. ¶¶ 75-77).

In his Motion to Dismiss, Defendant Barefoot contends that the property which is subject to Plaintiff's conversion claim is intangible property and therefore it is not subject to a claim for conversion. Defendant Barefoot also argues that the Complaint does not allege that Chase was deprived of the allegedly converted property. Finally, Defendant Barefoot argues that he came into rightful possession of any intellectual property or confidential information at issue, and that Plaintiff has not alleged any demand for return or refusal by Barefoot. (Barefoot Br. at 15.)

In response, Plaintiff argues that the Court should consider that "in today's age[,] digitally stored proprietary and confidential documents should be able to move forward on conversion claims." (Pl.'s Resp. [Doc. #16] at 16.) Plaintiff points to a line of decisions in the Western District of North Carolina. See, e.g., Bridgetree, Inc. v. Red F Marketing LLC, 2013 WL 443698, at *15 (W.D.N.C. Feb. 5, 2013). However, those cases generally involved allegations of a taking of "paper and electronic copies," and concluded that taking a copy can support a claim of conversion if there is evidence of taking away things of value that the individual was not authorized to take, and as to such copies, excluding the owner from exercising control over its proprietary and/or confidential documents and files. See, e.g., Springs v. Mayer Brown, LLP, No. 3:09cv352, 2012 WL 366283, at *9 (W.D.N.C. Jan. 27, 2012); see also TSC Research, 552 F. Supp. 2d at 542-43 ("As Defendants correctly point out in their brief, only tangible property is subject to conversion under North Carolina law. The description of property in the complaint, however, commingles tangible and intangible property by asserting that Defendants acquired 'proprietary technical and business information,' some, but not all, of which was memorialized in document form. There is no way for the parties or the Court to discern which part of Plaintiff's property was actually subject to conversion, that is, capable of being returned upon demand."); HCW Ret. & Fin. Servs., LLC v. HCW Emp. Ben. Servs., LLC, Nos. 10CVS1447, 13CVS2777, 2015 WL 4238193 (N.C. Super. Ct. July 14, 2015) (allowing for the possibility of a conversion claim for electronically-stored information "when taking the same information printed into hard copy form would be sufficient. As the court noted in Bridgetree, electronic storage of information in computer readable form 'is generally accepted as the preferred storage method for large

27

amounts of data and proprietary information in this modern age.' The Court also does not believe that the fundamentally 'intangible interests' discussed in <u>Nash Johnson</u>, business opportunities and expectancy interests, are the same type of property as customer information, which case law demonstrates is readily converted to tangible form." (internal citations omitted)).

Here, Plaintiff complains of Defendant Barefoot's "use" of its confidential information, but has failed to allege that Defendant Barefoot actually took copies of documents or files (whether paper or electronic) that he was not authorized to take and then deprived Plaintiff of access to those copies. Plaintiff has not alleged that it made a demand that Plaintiff return written or electronic forms of the property and that Barefoot refused. <u>Cf.</u> <u>River's Edge Pharms.</u>, 2012 WL 1439133, at *12 (finding sufficient allegation of the elements of a conversion claim where "Plaintiff has sufficiently alleged that it made a demand that [defendant] return the written and electronic forms of the of the property at issue, and that [defendant] subsequently refused"). Moreover, it appears that the substance of the claim Plaintiff intends to raise for conversion is proceeding in any event under its claim for misappropriation of trade secrets, as well as its claim for breach of contract.[7] As such,

---

[7] In the Complaint, Plaintiff asserts a claim for breach of contract based on, *inter alia*, alleged violation of Section 6 of the Agreement regarding alleged use and disclosure of confidential information, and that claim is proceeding in any event, as discussed above. In addition, in the briefing, Plaintiff notes that Defendant Barefoot was obligated to return "originals and all copies of any documents, electronically-stored data, communications and any other materials containing Confidential Information" as well as "all property belonging to the Company that he has in his possession, custody or control, including, but not limited to, electronic, computer or communications equipment, electronically stored information, keys, documents, records or materials of any kind," either on request or upon termination of his engagement with Plaintiff. (Independent Contractor Agreement Section 9 at 6.) The Complaint alleges that the Agreement was never officially terminated and that the term continued. However, if Defendant Barefoot takes the position that the Agreement was terminated, Plaintiff could seek leave to amend to add Section 9 to the breach of contract claims, for further consideration and briefing on that potential claim.

Plaintiff's claim for conversion should be dismissed, without prejudice to the substance of Plaintiff's claim proceeding as part of its claims for misappropriation of trade secrets and breach of contract. In addition, if further investigation reflects a basis for a conversion claim, Plaintiff may request leave to file an amended complaint setting forth additional facts and allegations in support of its claim for conversion.

### Count 5: Unfair and Deceptive Trade Practices (against both Defendants)

Plaintiff's fifth cause of action is for unfair and deceptive trade practices under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") against both Barefoot and R&J. Plaintiff bases this cause of action on its underlying claims for misappropriation of trade secrets and tortious interference with contract and prospective economic advantage. In addition, Plaintiff alleges that Defendants intentionally attempted to trade on Plaintiff's goodwill, reputation, and intellectual property in a manner to confuse customers and divert business to R&J, and conceal from customers that Barefoot was making contact with customers to solicit business away from Plaintiff, resulting in customer confusion. (Compl. ¶¶ 83, 84, 85.)

"UDTPA violations require a plaintiff to show that (1) the defendant committed an unfair or deceptive act or practice (2) that was in or affecting commerce and (3) proximately caused injury." Intercollegiate Women's Lacrosse Coaches Ass'n, 546 F. Supp. 3d at 455. "An act or practice is unfair if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and is deceptive if it has the capacity or tendency to deceive." Id. (internal quotations omitted). Defendants contend that Plaintiff cannot establish a UDTPA claim based on the alleged claims for misappropriation of trade secrets and tortious

29

interference because those underlying claims fail and should be dismissed. However, as discussed above, the Court recommends that those claims proceed. Therefore, Defendants' request to dismiss the UDTPA claims on that basis should be denied. See id. at 455-56. ("Tortious interference with contract claims may support unfair competition claims."); Drouillard v. Keister Williams Newspaper Servs., Inc., 108 N.C. App. 169, 172 (1992) (holding that a violation of the North Carolina Trade Secrets Protection Act that satisfies the three-prong test would be a violation of N.C.G.S. § 75–1.1); Static Control Components, Inc. v. Darkprint Imaging, Inc., 240 F. Supp. 2d 465, 487 (M.D.N.C. 2002) ("The North Carolina Court of Appeals has held that trade secret misappropriation can constitute a violation of § 75–1.1 if it also affects commerce and is the proximate cause of Static Control's actual injury.").

Defendants also contend that there was no alleged harm to external market participants, and that the alleged conduct therefore was not in or affecting commerce. However, as noted above, the Complaint alleges that Defendants misappropriated Plaintiff's trade secrets to interfere with sales to various customers, and that Defendants intentionally attempted to trade on Plaintiff's goodwill, reputation, and intellectual property to confuse customers and divert business to R&J, and conceal from customers that Barefoot was making contact with customers to solicit business away from Plaintiff, resulting in customer confusion. A fair inference from the factual allegations is that Defendant Barefoot contacted Plaintiff's customers, as he had in the past in his role with Plaintiff, but did not disclose that he was now working for R&J, and instead quoted new prices in an attempt to undercut Plaintiff, resulting

30

in confusion among customers. Plaintiff's allegations reflect an impact on multiple external market participants and reflect conduct in and affecting commerce.

Finally, Defendant Barefoot contends that Chase has not alleged substantial aggravating circumstances or harm beyond a breach of contract to adequately state a claim for UDTPA. (Barefoot Br. at 20.) In North Carolina, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under the UTPA, N.C.G.S. § 75–1.1." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) (internal brackets omitted) (quoting Branch Banking & Tr. Co. v. Thompson, 107 N.C. App. 53, 62 (1992)). North Carolina requires a showing of "substantial aggravating circumstances" before such a claim may be established from a breach of contract. Id. Plaintiff responds that Barefoot's actions went beyond the breach of contract, including aggravating circumstances involving additional tortious conduct such as misappropriation of trade secrets and wrongful interference, as well as Barefoot's deception to customers and the resulting confusion in the market. Plaintiff alleges that Barefoot acted as an agent of R&J, and that R&J is therefore also liable for Barefoot's actions. Having reviewed the contentions, the Court concludes that at this stage of litigation, Plaintiff has pled sufficient aggravating circumstances to state a claim for unfair and deceptive trade practices that is separate and beyond the breach of contract claim, and that is supported by the factual allegations.

For all of these reasons, Defendants' Motions to Dismiss the UDTPA claim should be denied.

31

**Count 6:     Civil Conspiracy (against both Defendants)**

Plaintiff also brings a claim for civil conspiracy, alleging that Barefoot and R&J agreed to use Plaintiff's intellectual property and confidential information in an effort to poach Plaintiff's customers and suppliers. In the Motions to Dismiss, Barefoot and R&J contend that the Court should dismiss Plaintiff's civil conspiracy claim under the intracorporate conspiracy doctrine, since Plaintiff alleges that Barefoot acted as an agent of R&J, and a corporation cannot conspire with its agent. Defendant Barefoot also notes that there is no independent claim for civil conspiracy in North Carolina, and that there must be an underlying claim.

"The elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." Piraino Bros., LLC v. Atl. Fin. Grp., Inc., 211 N.C. App. 343, 350 (2011) (quotation omitted); Henry v. Deen, 310 N.C. 75, 87 (1984). However, "[i]t is well established that there is not a separate civil action for civil conspiracy in North Carolina. Instead, civil conspiracy is premised on the underlying act." Piraino Bros., 211 N.C. App. at 350 (quotation omitted). Thus, "[a] civil conspiracy claim must be based on an adequately pled underlying claim." USA Trouser, S.A. de C.V. v. Williams, 258 N.C. App. 192, 201 (2018).

"The intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own." Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 352 (4th Cir. 2013); Seguro-Suarez v. Key Risk Ins. Co., 261 N.C. App. 200, 218 (2018) ("[A]n allegation that a corporation is conspiring with its agents, officers

32

Case 1:24-cv-00351-TDS-JEP     Document 26     Filed 02/27/25     Page 32 of 37

or employees is tantamount to accusing a corporation of conspiring with itself[,] and is therefore insufficient to establish a claim for civil conspiracy." (internal quotation omitted)). Thus, to the extent that the Complaint alleges that Barefoot was an agent of R&J, it cannot allege a conspiracy between the two. Plaintiff does not contest the general principle or applicability of the intracorporate conspiracy doctrine, rather, Plaintiff contends that Barefoot and R&J's relationship falls under an exception because Barefoot possessed a personal stake independent of his relationship with R&J. "[A]n exception to the [intracorporate conspiracy] doctrine exists if the corporate agent has an independent personal stake in achieving the corporation's illegal objective." State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 184 N.C. App. 613, 625 (2007) (internal quotation omitted), rev'd on other grounds, 362 N.C. 432 (2008). "The personal interest must be 'wholly separable' from the interests of the corporation for the exception to apply." Hicks v. Mount Airy-Surry Cnty. Airport Auth., No. 1:15-CV-38, 2015 WL 8484453, at *12 (M.D.N.C. Dec. 9, 2015). In this case, Plaintiff has not identified nor alleged that Barefoot had an independent personal stake to support its argument that the exception applies, and it is not clear from the allegations in the Complaint how Barefoot, with an independent stake, was conspiring with R&J.

Notably, however, Plaintiff further contends that "should the Court determine that civil conspiracy is an inexact articulation of the claim, then the Court should allow Plaintiff to correct or clarify any insufficient statements and let it be made clear that Plaintiff seeks recovery against the agent, principal, or both as allowable under North Carolina law." (Pl.'s Resp. [Doc. #22] at 15.) On this point, it is clear from the Complaint that Plaintiff alleges that Barefoot was an agent of R&J, and that Plaintiff seeks recovery from Barefoot and R&J (either

33

or both) as to each claim that is asserted against both Defendants. The dismissal of the conspiracy charge would not change that or affect the substance of the other claims proceeding. See, e.g., Henry, 310 N.C. at 86-87 ("In civil actions for recovery for injury caused by acts committed pursuant to a conspiracy, this Court has stated that the combination or conspiracy charged does no more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under the proper circumstances the acts of one may be admissible against all. The gravamen of the action is the resultant injury, and not the conspiracy itself.").

In the circumstances, the Court will recommend that the conspiracy claim be dismissed as a separate claim, in light of the intracorporate conspiracy principle and Plaintiff's allegation that Barefoot was an agent of R&J, but the Court will still consider the substance of Plaintiff's claims against Barefoot, separately and as agent, and against R&J, separately and as principal, under North Carolina law.[8]

**Count 7:    Unjust Enrichment (against both Defendants)**

Finally, Plaintiff brings a claim for unjust enrichment against both Defendants. Unjust enrichment is "'claim in quasi contract or a contract implied in law. . . . If there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract.'" Rev O, Inc. v. Woo, 220 N.C. App. 76, 80-81 (2012) (quoting Booe v. Shadrick, 322 N.C. 567, 570 (1988)). To sufficiently plead unjust enrichment under North Carolina law, a plaintiff must show that it "conferred a benefit on another, the other party consciously accepted the

---

[8] In addition, if R&J contends that Barefoot was not acting as its agent, Plaintiff could seek leave to amend to assert the conspiracy claim to the extent that Barefoot was not R&J's agent.

34

benefit, and the benefit was not conferred gratuitously." Humana, Inc. v. Ameritox, LLC, 267 F. Supp. 3d 669, 678 (M.D.N.C. 2017).

In his Motion to Dismiss, Barefoot contends that Plaintiff cannot state a claim for unjust enrichment because Plaintiff alleges that the Agreement was a contract between Plaintiff and Barefoot, which would govern the claim. Barefoot further contends that the Complaint does not allege that Plaintiff conferred a benefit on Barefoot other than his payment for services pursuant to the Agreement. (Barefoot Br. at 17.) R&J similarly argues that Plaintiff cannot state a claim for unjust enrichment against it because the Complaint does not allege that Plaintiff conferred a benefit on R&J. (R&J Br. at 10.) Defendants both contend that to the extent the Complaint alleges that Defendants took some benefit, that would not constitute unjust enrichment. (R&J Br. at 10; Barefoot Br. at 17-18.)

In response, Plaintiff contends that the unjust enrichment claim is alleged in the alternative to the breach of contract claim. Plaintiff also argues that it has sufficiently pled that a benefit was conferred to Barefoot based on the transfer to Barefoot of valuable information, including Plaintiff's confidential information and intellectual property. With respect to R&J, Plaintiff argues that it sufficiently alleged that it transferred its intellectual property and confidential information to R&J through Barefoot.

With respect to Plaintiff's unjust enrichment claim against Barefoot, the claim is pled in the alternative to the breach of contract claim, if it is determined that the Agreement was not valid or enforceable or in effect. Plaintiff alleges certain benefits that it provided to Barefoot, and that Barefoot accepted. Ultimately, consideration of this claim requires consideration of the terms, termination, and timeline of the Agreement as well as other factual

35

contentions related to the enforceability of the Agreement, and the unjust enrichment claim would only exist as an alternative to the breach of contract claim. As such, Barefoot's motion should be denied at this time, without prejudice to further consideration on dispositive motions after discovery and a more complete presentation of the record.

However, with respect to Plaintiff's unjust enrichment claim against R&J, a claim for unjust enrichment is based on a contract implied in law. Plaintiff does not allege that it conferred a benefit on R&J or that there was an implied contract between it and R&J, rather that R&J engaged in tortious behavior and thereby obtained some benefit at the expense of Plaintiff. See KNC Techs., LLC v. Tutton, No. 19 CVS 793, 2019 WL 6219035, at *14 (N.C. Super. Ct. Oct. 9, 2019). As currently pleaded, the Complaint does not set forth a claim for unjust enrichment against R&J, and therefore R&J's motion should be granted as to Plaintiff's claim for unjust enrichment.[9]

---

[9] Plaintiff cites to Med. Staffing Network, Inc. v. Ridgeway, 194 N.C. App. 649, 660 (2009), which notes that the measure of damages for a claim of misappropriation of trade secrets can include either the economic loss of the claimant or the "extent to which [the misappropriator] has unjustly benefited" from the trade secrets. The dismissal of the claim for unjust enrichment against R&J does not affect the potential calculation of damages for the remaining claims.

36

III.     **CONCLUSION**

IT IS RECOMMENDED that Defendant Barefoot's Motion [Doc. #12] be denied, except that Defendant Barefoot's Motion be granted solely as to Plaintiff's claims against him for conversion (claim 4) and civil conspiracy (claim 6), as further set out herein.

IT IS FURTHER RECOMMENDED that Defendant R&J's Motion [Doc. #14] be denied, except that Defendant R&J's Motion be granted solely as to Plaintiff's claims against it for civil conspiracy (claim 6) and unjust enrichment (claim 7) as further set out herein.

This, the 27th day of February, 2025.

Joi Elizabeth Peake
United States Magistrate Judge

37